Filed 11/15/13  In re Olivia V. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re OLIVIA V., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | |
| Plaintiff and Respondent, | G048235 |
| v. | (Super. Ct. No. DP019167) |
| S.V., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gary Bischoff, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Plaintiff and Respondent.

S.V. (Mother) appeals from a judgment terminating her parental rights with respect to her four-year-old daughter Olivia. She contends the juvenile court erred in denying her request for an evidentiary hearing on her petition for modification and by failing to apply the so-called "benefit exception" to termination. Finding these contentions unmeritorious, we affirm the judgment.

FACTS

Mother has a history of substance abuse, mental illness and drug-related criminal activity. In November 2009, she was jailed for violating probation after testing positive for methamphetamine and failing to comply with her mental health treatment plan. Olivia's father was also in jail, so Olivia and her three siblings were detained and placed in protective custody. At that time, Olivia was 8 months old, and her sisters Melissa, E. and Haley were 16, 13 and 7 years old, respectively.[1]

On December 23, 2009, Olivia was placed in the foster home of Maria and Jorge M. A reunification plan was established for Olivia's family, and over the next 14 months, Mother made good on the plan. Upon her release from prison, she moved into a recovery home, completed a drug program and received treatment for her mental illness (drug-induced psychosis and depression). She also worked two jobs, visited Olivia regularly and tested clean on all of her drug tests. Accordingly, on March 29, 2011, the juvenile court returned all of the children to her care under a family maintenance plan. At that time, Olivia was two years old.

As a single, working mother of four, Mother looked to her oldest child Melissa, who was then 18 years old, for help with the other children. Mother also relied on Maria and Jorge to care for Olivia when she was at work. Having already spent over a year living with Maria and Jorge, Olivia was bonded to them and comfortable in their

---

[1] E. and Olivia are Mother's biological children, and Melissa and Haley were adopted by Mother after her sister's parental rights over them were terminated. Although Olivia's siblings and her father are not parties to this appeal, they will be referred to as needed to explain the facts of this case.

2

care.  Mother also received special services through the "Wraparound" program, because Haley had severe emotional and behavioral problems.

Despite everyone's efforts, Mother began to feel overwhelmed.  She managed to move the family into a three-bedroom house and was making good progress on her mental health issues, but she was having trouble keeping up the home and arranging the children's various appointments.  Worse yet, she began missing some of her drug tests, and in March 2012, she tested positive for methamphetamine.  Although she initially denied using drugs, she eventually admitted giving in to her urge to use methamphetamine.

The relapse prompted social services to file a supplemental dependency petition in April 2012.  Mother pleaded no contest to the allegations of drug use and failure to protect.  E. and Haley were taken to Orangewood Children's Home, and Olivia was placed with her father Robert E.  However, Robert couldn't handle caring for a three year old, so Olivia was placed back into Maria and Jorge's foster home on June 15, 2012.  Having lived there before, and in light of her continuing contact with Maria and Jorge during the family maintenance period, Olivia made a smooth adjustment into their home.  Described as happy, playful and developmentally on track, Olivia showed no signs of stress from the transition.

During this second period of dependency, Mother resumed drug treatment.  It was at least the fifth time in her life she had enrolled in a treatment program to overcome addiction.  This time around, she was angry and defensive in therapy and refused to take responsibility for her actions.  And although nearly all of her drug tests came back negative, she did test positive for cocaine on one occasion in July 2012.[2]  At a hearing the following month, her attorney admitted there was no basis for additional

---

[2]     The positive test was derived from the analysis of one of Mother's hair follicles.  She disputed the results, and a subsequent hair follicle test came back negative for illegal drugs.

3

reunification services or returning Olivia to Mother's care. The court agreed and scheduled a hearing to determine a permanent placement plan for Olivia.

Pending that hearing, Mother was allowed to visit Olivia three times a week for two hours a visit. In addition, Mother was allowed to participate in the bi-weekly visits Olivia had with her siblings. Most of the visits were monitored by Maria or Jorge, and they usually took place at a park or a McDonald's. At first, Mother was not very engaged during the visits. In fact, during the sibling visits, E. was the one who primarily tended to Olivia, not Mother. However, toward the fall of 2012, Mother started to become more attentive to Olivia during visitation. She brought her toys and played with her, and Olivia seemed to enjoy the attention. However, Olivia was reluctant to attend some of the visits, and when they were done, she didn't seem to mind departing from Mother.

Mother's social worker observed the visits on October 19 and November 14, 2012. She reported Mother was playful with Olivia and interacted with her in an appropriate manner. Olivia was happy and liked being with Mother. She did not initiate affection with Mother, but when Mother hugged and kissed her, she reciprocated in like fashion. The visits ended with Mother placing Olivia in her car seat and telling her she loved her. Olivia remained in a good mood and calmly said goodbye.

As of December 3, 2012, it was the social worker's opinion that "[d]espite the frequent visitation, . . . Olivia does not appear to have a strong attachment to [Mother]. Though Olivia appears to enjoy her visits with [Mother], Olivia does not appear to seek [Mother] for care and comfort. Olivia is . . . at ease away from [Mother and her siblings] and [does] not show signs of distress at leaving them at the end of the visits or at being apart from them. Olivia is noted to be particularly attached to her current caregivers (Maria and Jorge, whom she calls "mami" and "papi"), who have cared for her since she was approximately eight months old. [They] have indicated that they are willing to adopt her and want to provide her a loving and permanent home." The

4

social worker's recommendation at that time was to terminate Mother's parental rights and free Olivia for adoption.

On December 12, 2012, Mother informed her social worker she had read her reports and was concerned Maria and Jorge were not providing her with complete information about her visits with Olivia. She claimed there were visits when Olivia cried and asked to come home with her when the visits were over. However, Maria and Jorge did not report this to the social worker. Mother claimed this was because Maria and Jorge wanted to adopt Olivia. She accused them of having a conflict of interest and said her attorney had told her she could request a professional monitor. The social worker told Mother she had not perceived any bias or inappropriate behavior by Maria or Jorge, and thus there was no reason for a professional monitor.

Apparently, the social worker talked to Maria and Jorge about Mother's allegations. According to the social worker, Jorge told her that "at the end of the visits that took place on December 5th and December 7th, [Olivia] cried because she did not want the visit to end. On one of those days [Olivia] also told [Mother] 'I want to go with you.' [Mother] replied by saying 'soon' and ended the visit without incident. . . . [Olivia] did not continue to cry once they drove away from the visitation site and did not make further requests to go with [Mother]."

Despite this information, the social worker's assessment of the situation remained the same. Noting that "Olivia has been healthy and continues to thrive in her current placement," the social worker "continue[d] to recommend that parental rights be terminated as to Olivia in order for her to remain in a stable and permanent home through adoption."

After monitoring a family visit that occurred on December 16, 2012, the social worker reported Mother gave Olivia and her siblings early Christmas gifts that day. Olivia was more focused on playing with her toys than interacting with her family, and at the end of the visit, she was calm and content. E. carried her to her car and instructed her

5

to tell Mother she loved her, which she did.  Olivia remained calm and did not show any signs of distress throughout her departure.

Mother continued to visit Olivia on a regular basis in January 2013.  Maria and Jorge reported the visits were positive and Mother acted appropriately.  Olivia was playful with Mother and returned in a good mood.  However, when Olivia was away from Mother, she didn't ask about her or request to see her.  At home with Maria and Jorge, she was at ease and looked to Maria for comfort.  Her disposition was upbeat and she showed no signs of stress or anxiety.  Maria and Jorge agreed that, if they were allowed to adopt Olivia, they would allow her to visit her siblings on a regular basis.

On February 6, 2013, the social worker monitored a visit between Olivia and Mother at a McDonald's restaurant.  Mother brought Olivia a puzzle and coloring supplies and was attentive to her throughout the visit.  She also initiated physical contact with Olivia.  Olivia was happy and comfortable with Mother and reciprocated her gestures of affection.  At the end of the visit, they exchanged hugs and kisses, and Olivia remained calm.  When she got home, she wanted to be held by Maria and was at ease in her arms.

The next scheduled visit was on February 8, 2013.  After waiting for an hour for Mother to show up, Jorge decided to leave the visitation site with Olivia.  Olivia asked why they were leaving, but she did not seem upset when told it was because Mother had not arrived.  When Olivia got home, she told Maria that her "mommy" did not show up, but as before, she did not appear upset.  Mother called Jorge later that night.  Although she did not explain why she was late, Jorge agreed to take Olivia back to McDonald's for a visit.  The visit went fine, but afterwards Olivia got sick and vomited several times.

At Mother's request, all subsequent visits were monitored by independent third parties.  On February 15, 2013, the social worker observed that Olivia slept halfway through the visit, and when she awoke, she asked for "mommy Maria."  However, she

eventually played with Mother, whom she called "mommy," and was in a good mood for most of the time. At the end of the visit, Mother placed Olivia in her car seat and gave her a hug. Olivia said goodbye and remained in a good mood as her car pulled away.

On February 19, 2013, a social worker who was not otherwise involved in the case monitored the visit between Mother and Olivia. Maria was also present during this visit. At the start, Olivia did not acknowledge Mother, and Mother had to go up and give her a hug to get her to notice her. Mother then tried to interest Olivia in some toys she had brought her, but she was not successful. During the first 30 minutes of the visit, Olivia asked for "mommy Maria" three times. For the remainder of the visit, Olivia mostly played with other children in the area without directly interacting with Mother. However, when she was not playing, she enjoyed being held by Mother. And at one point, Mother gave her a piggyback ride, and she became very animated. At the end of the visit, Olivia did not cry or appear upset.

The independent monitor for the visit on February 20, 2013 was Dr. Rosalva Martinez, a foster care worker. Dr. Martinez observed Olivia slept during the first hour of the visit. She then slowly warmed to Mother and colored and played with her for the second hour. When the visit was over, Olivia had some difficulty saying goodbye because she wanted to keep coloring. Mother said I love you, and Olivia told her the same. When Maria arrived, Olivia ran up to her, gave her a hug, and asked her about other members of her family.

On February 22, 2013, Mother's social worker monitored visitation. Mother brought Olivia some toys and coloring materials, and Olivia greeted her happily. While they were coloring, Olivia asked for Maria and Jorge. She then went over to a play structure, and Mother joined her there. Later in the visit, Olivia said she wanted to go home, but Mother talked her into coloring some more. When it was time for Mother to go, she asked for a hug, and Olivia obliged. Overall, the visit was happy and playful.

7

Mother was focused on Olivia and acted appropriately, but Olivia did not show any signs of distress after Mother left.

The visit on February 26, 2013 was similar in many respects. At Olivia's request, Mother picked her up and carried her around in a playful fashion. Olivia enjoyed the attention, but at one point she asked for her "sister" Lupe, who is Maria's daughter. When Mother was taking Olivia to her car at the end of the visit, Olivia was crying about a toy she had misplaced. She did not respond when Mother told her goodbye.

The next visit was monitored by Dr. Martinez. When Mother arrived, Olivia did not make eye contact with her and instead looked around for Maria. But she slowly warmed up to Mother and they colored and played games together. While Olivia was coloring, she said Maria had told her that, when she was born, she "came out of her (Maria's) tummy." Mother corrected her, but Olivia insisted she came out of "mommy Maria." Dr. Martinez told Mother she would talk to Maria about this. Olivia spent the rest of the visit talking and playing with Mother. When it was time for her to go, she said bye to Mother, gave her a kiss, and appeared to be in a good mood.

On March 1, 2013, Mother told her social worker that Maria and Jorge were "pushing" Olivia to refer to their children as her brothers and sisters. Mother further alleged they told Olivia she was "loca" when Olivia told them Mother was her biological mother. Mother also renewed her complaint about Jorge and Maria observing visitation and expressed concern her relationship with Olivia was not being accurately reported. The social worker told Mother the observations about visitation have been consistent among the various monitors. It was the social worker's opinion that, although the visits were going fine, their impact on Olivia "appears to be ephemeral, as the child shows no distress upon being separated from [Mother] and appears content to return to [Maria and Jorge]," with whom she has a "strong attachment."

Throughout this period, Mother continued her drug treatment and tested negative on all of her drug tests. However, she struggled to make headway on her

relationship with Olivia, as evidenced by their final reported visit, which occurred on March 5, 2013. That day, Olivia told Maria she did not want to visit Mother, but Maria convinced her to go. However, when they got to the visitation site, Olivia clung tightly to Maria and ignored Mother. Feeling rejected, Mother started to cry, as did Maria. Maria begged Olivia to engage with Mother, but she refused. She simply thanked Mother for the toys she had brought her and walked back to Maria. Mother suggested they reschedule the visit and tearfully departed.

When the social worker visited Olivia's home later that day, Jorge told her Olivia seemed fine when she returned home. He did not notice anything peculiar about her behavior, and the social worker observed she was playing and seemed to be in a good mood. When the social worker asked her why she didn't want to visit Mother that day, she said she just didn't want to. She also said she didn't want to visit Mother the following day, because Mother was boring and she wanted to be with "mommy Maria."

Jorge told the social worker Olivia is very attached to Maria and usually asks for her when she wakes up in the morning. He also said Olivia usually wants Maria to come along with her when she is visiting Mother. Maria confirmed this. She told the social worker that, besides that day, there had been other times when Olivia did not want to see Mother, but she has always encouraged her to do so. Maria said this was the first time Olivia outright refused to visit Mother.

On the heels of that refusal, Mother filed a modification petition and asked the court to return Olivia to her custody under a family maintenance plan or order reunification services and unmonitored visitation. In support of her request, Mother submitted a declaration stating, "I have demonstrated continued sobriety since the last reporting period and have attended near-daily A.A. [Alcoholics Anonymous] meetings . . . ." Mother also alleged she had an A.A. sponsor, and her recovery was more of a priority for her now than it was in the past. And she claimed she had addressed her mental health issues, was employed and had a stable residence. Finally, Mother claimed

9

she has consistently visited Olivia for six hours a week, and Olivia has demonstrated a bond to her. In that regard, Mother alleged Olivia calls her "mom," looks to her to provide care, and has expressed a desire to go home with her.

The court took up Mother's modification petition on March 11, 2013, which was the date of Olivia's permanent placement hearing. Although Mother requested an evidentiary hearing on her petition, the court determined there was no need for one because 1) her declaration was conclusory, and 2) even if everything she alleged was true, she failed to show there was a change of circumstances or her requested relief would be in Olivia's best interests. Therefore, the court denied the petition on its face.

The court then turned to the issue of Olivia's permanent placement. In addition to considering the social workers' numerous reports, which span hundreds of pages, the court also entertained testimony from Mother, her current social worker, and her oldest daughter Melissa.

Social worker Martha Corona testified she was assigned to the case on August 30, 2012.[3] She has met with Olivia seven times at Maria and Jorge's residence and monitored eleven visits involving Olivia and Mother. The last visit she monitored was on March 8, 2013. When saying goodbye to Mother at the end of that visit, Olivia said, "I wish I want to live with you." Corona didn't know what that meant or seek clarification from Olivia. Corona also admitted she has never asked Olivia if she misses Mother. Olivia has told her she enjoys visiting Mother, and Corona has observed that Olivia is usually happy to see her mom. However, Corona did not believe they have a strong attachment because, although Olivia is usually glad to see Mother, she does not get excited when they meet. And when their visits are over, she is usually content to go on her way. Corona also noted Olivia is very comfortable when she is in the care of Maria and Jorge.

---

[3] Prior to that time, Julia Cavin was Mother's social worker.

Speaking to Maria and Jorge's integrity and possible bias, Corona testified they were questioned about some of the statements they allegedly made to Olivia. They denied telling Olivia that she was loca or that Maria was her biological mother. Corona felt they fairly monitored and reported on visitation. She said she has used professional monitors in the past, but they cost her agency money, and its current practice is to utilize the child's foster parents as monitors for visitation. Corona also pointed out that, despite her belief that Maria and Jorge were accurate and reliable reporters, she and several other social workers monitored visitation throughout the case.

Mother testified she has been sober since her children were removed from her care in 2012. She is currently on the third step of her drug treatment program and is committed to maintaining a clean lifestyle because her "heart" and "desire" are different now. Mother also said she is currently receiving mental health services and is fully compliant with her medication requirements.

Regarding visitation, Mother testified Olivia sometimes hugs and kisses her at the start of their visits, and sometimes she runs straight to the play structure when they are at McDonald's. Mother brings her toys and games, and they play together, but it is hard to compete with the play structure for Olivia's attention. Yet, when they do play together, "it's with complete affection on both sides." Olivia likes it when she carries her around, and she always calls her "mom." As proof of their affection, Mother provided photographs showing her and Olivia hugging and laughing at their visits. Mother said it's hard for her to describe their closeness, but "I know that she knows I'm her mom." She said Olivia blows her kisses and "seems very confused" when their visits are over. Mother thinks this is because Olivia wants to go home with her, but she is also comfortable with Maria and Jorge. Mother admitted Olivia is "close" and "bonded" to Maria and Jorge, and she shows no signs of reluctance when returning to their care.

However, Mother said Olivia was more affectionate with Maria than Jorge. She accused both Jorge and social worker Corona of failing to report information that

11

was favorable to her, saying there were "a couple occasions where Olivia did say some things and it was not in the report." For instance, there were actually four visits during which Olivia requested to come home with her, but Jorge only reported one of them. In addition, there were times when Olivia asked Mother why she can't go home with her. Mother said that even when she told these things to Corona, she did not include them in her reports.

The final witness was Olivia's sister Melissa, who was 20 years old at the time of the hearing. She testified Olivia and Mother have always been very close, and during the time they lived together, Olivia followed Mother around like "a little puppy." Mother gave Olivia a lot of loving care and attention back then. And when they see each other now, Olivia is always happy to visit and spend time with Mother. They talk and play together, and when the visits are over, Olivia usually gets "really upset" and asks when she can go home with Mother. On cross-examination, Melissa admitted that most of the visits she attended occurred in 2012 and that she hadn't been to a lot of visits during the past couple of months.

In arguing the matter to the court, Mother's attorney urged the court to apply the so-called "benefit exception" to adoption on the basis Mother has maintained regular visitation with Olivia, and they have a "substantial positive emotional attachment." Mother's counsel also argued that having Maria and Jorge monitor visitation violated Mother's due process right to maintain her familial relationship with Olivia without undue influence and biased reporting. She urged the court to apply equitable considerations in deciding on what would be best for Olivia.

In making its ruling, the juvenile court did express concern about the practice of having foster parents monitor visitation. It opined the practice was "bad social work" because foster parents often have an interest in adopting the child they are monitoring, and they are generally less qualified than professional monitors to observe and report on visitation. Still, the court did not believe Maria and Jorge's role in

12

visitation interfered with Mother and Olivia's relationship. The court determined Mother's plight was attributable to her own failings on the drug front. And although Olivia did request to go home with her after a few of their visits, that was not very significant in the grand scheme of things because there were many more visits (over 100) during which Olivia left Mother's company without showing any signs of longing or distress. All things considered, the court felt that not only would termination of parental rights not be detrimental to Olivia, it would actually be in her best interest. Therefore, it terminated Mother's parental rights, freeing Olivia for adoption.

I

Mother contends the court erred in denying her modification petition without an evidentiary hearing. We cannot agree.

A parent petitioning to modify a previous dependency order must show there has been a material change of circumstances, and the proposed modification promotes the best interests of the children involved. (Welf. & Inst. Code, § 388; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47-48.) To justify an evidentiary hearing on the petition, a parent need not demonstrate a probability of success on the merits. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.) However, he or she must at least make out a prima facie case for relief. (*Ibid*.) And although the petition must be liberally construed in the parent's favor, "[t]he prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

Mother's petition did not allege such facts. In her declaration, Mother alleged she was working and had a stable residence, but that has been the case ever since Mother was released from jail back in 2010. There were no changed circumstances alleged with respect to Mother's employment or housing situation.

Nor was anything materially different in regard to visitation or Mother's mental health situation. Mother visited Olivia on a regular basis throughout the case, and

13

she consistently attended to her mental health needs by going to therapy and taking her medication. While Mother is to be commended for those things, they do not constitute a change of circumstances from what had been occurring in the case.

In her petition, Mother also alleged she was sober, attending A.A. meetings on a near-daily basis, and had an A.A. sponsor. However, there have been several periods in Mother's life during which she has been in recovery mode. The problem is, she has never been able to stay the course and overcome her drug problem. Even before this case arose, Mother had sought help for her addiction and completed drug treatment. However, she relapsed in 2009, violating her probation in the process. She then completed another drug program as part of her reunification plan before relapsing again in 2012. So the fact she was sober and going to A.A. at the time she filed her modification petition in 2013 was not really a change of circumstances so much as a continuation of her on-going – and commendable – effort to lick her addiction. Considering her lengthy drug history, it did not warrant returning Olivia to her care, additional reunification services, or unmonitored visitation.

In fact, nothing Mother alleged in her petition constituted a change of circumstances or warranted a modification of the case plan. Therefore, the trial court was fully justified in denying the petition without an evidentiary hearing. No abuse of discretion has been shown.

II

Mother also challenges the juvenile court's decision to terminate her parental rights and free Olivia for adoption. She claims the court should have invoked the benefit exception to termination and placed Olivia under a legal guardianship. But this too was a discretionary call, and we cannot say that discretion was abused.

As explained in *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573, adoption is the preferred plan when a child cannot be returned to his or her parents. "'Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the

14

child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' [Citation.] Adoption, of course, requires terminating the natural parents' legal rights to the child; guardianship and long-term foster care leave parental rights intact. After the parent has failed to reunify and the court has found the child likely to be adopted, it is the parent's burden to show exceptional circumstances exist. [Citation.]" (*Id*. at p. 574.)

Exceptional circumstances exist if, "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).) This means "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) In this regard, we must remember that "[i]nteraction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Ibid*.) In other words, the parent must occupy more than a "pleasant place" in the child's life (*In re Elizabeth M*. (1997) 52 Cal.App.4th 318, 324), and parent-child relationship must be characterized by something more than "frequent and loving contact." (*In re L. Y. L*. (2002) 101 Cal.App.4th 942, 953.)

While Mother visited Olivia regularly, there is no evidence of a significant, positive, emotional attachment between them. Some of their visits were affectionate and pleasant to be sure, but others were not. And as the trial court noted, the vast majority of the visits ended easily with no signs of distress or disappointment from Olivia. On the

15

other hand, the record shows Olivia is strongly attached to Maria and even asked for her at times when she was visiting Mother. That's hardly surprising considering Maria and Jorge have cared for Olivia most of her life. Because of Mother's serious drug issues, they have been the most consistent source of comfort and support for Olivia.

Mother renews her claim that having Olivia's foster parents act as monitors was unfair. Accusing Maria and Jorge of having an "internal bias," Mother argues that because they "monitored the visits until the very last month or so of the case, the reports are really tainted and not a reliable source of evidence from which the court could conclude that the child would detrimentally suffer from the termination of the parent-child relationship."[4]

However, not all of the information Maria and Jorge provided was unfavorable toward Mother. In fact, Jorge told the social worker that, sometimes at the end of visits, Olivia cried and asked to go home with Mother. He also reported how Olivia and Mother interacted and played together during the visits. Not everything he reported was positive about Mother, but it wasn't all negative either.

Moreover, in reading the voluminous and detailed information supplied by the independent monitors, it is striking how similar it is to the information supplied by Maria and Jorge. Like Maria and Jorge, the independent monitors generally described the visits as playful and upbeat, but they noted that sometimes Olivia would wander off from Mother and play on her own, and sometimes she would look around for Maria and ask for her by name. They also noted that the affection, to the extent it occurred, was usually initiated by Mother, not Olivia. And none of the independent monitors reported Olivia was greatly disappointed or showed signs of separation anxiety when the visits

---

[4] In so arguing, Mother draws our attention to rule 5.220 of the California Rules of Court. That rule applies to child custody investigators who have been appointed in family law cases to report on the best interest of children with respect to custody and visitation issues. The rule does not apply in juvenile dependency cases. (See Cal. Rules of Court, rule 5.220(b).)

were over.  In fact, it is undisputed that Olivia did not want to see Mother at all during their final reported visit in early March.

In light of this, we do not believe the proceedings were fundamentally unfair or violated Mother's due process rights.  The trial court took Mother's allegations of bias very seriously, as do we, but it ultimately determined additional independent monitoring would not have changed the outcome.  Based on the entire record of the case, we cannot disagree with that assessment.  The case was in the system for over three years, during which Mother was provided extensive services and allowed regular visitation.  Yet, she was unable to resolve her drug problem or even progress to the point of unmonitored visitation with Olivia.  On the other side of the ledger, the record is clear that Olivia has flourished in Maria and Jorge's care and developed a deep emotional bond with them.  This positive, loving connection will enable Olivia to continue to reap substantial personal and emotional benefits.  Weighing those benefits against the incidental gains Olivia would derive from preserving her parental ties, we cannot say the juvenile court erred.  There is no basis for disturbing its decision terminating Mother's parental rights over Olivia and freeing her for adoption.

## DISPOSITION

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


IKOLA, J.

17